**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**DAVID S.**

                **Plaintiff,**

v.                                                                                          5:20-CV-01176 (NAM)

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,** [1]

                **Defendant.**

---

**APPEARANCES:**

Howard D. Olinsky
Olinsky Law Group
250 South Clinton Street, Suite 210
Syracuse, NY 13202
*Attorney for Plaintiff*

Christopher Lewis Potter
Social Security Administration
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, MA 02203
*Attorney for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.   INTRODUCTION**

      Plaintiff David S. filed this action on September 25, 2020 under 42 U.S.C. § 405(g), challenging the denial of his application for social security disability insurance benefits under the Social Security Act. (Dkt. No. 1). After carefully reviewing the administrative record, ("R,"

---

[1] Plaintiff commenced this action against the "Commissioner of Social Security." (Dkt. No. 1). Kilolo Kijakazi became the Acting Commissioner on July 9, 2021 and will be substituted as the named defendant in this action pursuant to Fed. R. Civ. P. 25(d).

1

Dkt. No. 12), and the parties' briefs (Dkt. Nos. 18, 22), the Court reverses the decision of the Commissioner and remands for further proceedings.

## II.    BACKGROUND

Plaintiff applied for disability insurance benefits on November 12, 2015, alleging that he had been disabled since July 9, 2014.  (R. 66–67).  Plaintiff claimed to be disabled due to the following conditions: peripheral neuropathy, generalized anxiety disorder, background retinopathy, Raynaud's Syndrome (a condition affecting sensitivity in the extremities), and Attention Deficit Hyperactivity Disorder ("ADHD").  (R. 66–67).

The Social Security Administration ("SSA") denied Plaintiff's claim on March 22, 2017.  (R. 65).  Plaintiff appealed the decision and requested a hearing, which was held on April 26, 2019 before Administrative Law Judge ("ALJ") David Romeo.  (R. 31–64).  On May 7, 2019, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 10–22).  Plaintiff's subsequent request for review by the Appeals Council was denied.  (R. 1).  Plaintiff then commenced this action.  (Dkt. No. 1).

### A.  Plaintiff's Testimony

Plaintiff was 44 years old as of the hearing on April 26, 2019.  (R. 35).  He lived with his mother, who had supported him financially since 2014.  (R. 35).  He completed two years of college and had past work experience as a senior coordinator for the local government.  (R. 36).  Plaintiff testified that he stopped working in 2014 due to his anxiety and depression, and what he described as an "acute stress reaction."  (R. 40).

Plaintiff has a history of insulin-dependent diabetes for which he uses a pump.  (R. 41).  Plaintiff testified that he experiences significant fluctuations in his blood sugar levels, which cause headaches, dehydration, frustration, anger, and irritability.  (R. 42).  Plaintiff testified that

he has additional physical conditions including peripheral neuropathy in his hands and feet, retinopathy in his eyes, fibromyalgia, and Reynaud's disease. (R. 43–45). Plaintiff also testified that he has mental health conditions including anxiety and depression, for which he takes medication and sees a therapist. (R. 47, 51).

As to daily activities, Plaintiff testified that he enjoys fishing, traveling, mushrooming, and metal detecting. (R. 51). He also enjoys spending time with his girlfriend, whom he has helped with some home repairs. (R. 49, 52). He reported doing some light cleaning and yard work but that he must work slowly and take breaks. (R. 54). He said that he does not socialize but attends weekly AA meetings. (R. 54).

### B. Medical Records

During the relevant time period, Plaintiff has received treatment from numerous providers and been assessed physically and mentally by various medical professionals. Given the voluminous nature of Plaintiff's medical records (which total more than 1,000 pages), the Court assumes familiarity with those described in the parties' respective briefs. The Court will discuss specific medical records in detail as necessary below.

### C. ALJ's Decision Denying Benefits

At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 9, 2014, the alleged onset date of disability. (R. 12). At step two, the ALJ determined that Plaintiff suffered from several "severe" impairments: diabetes mellitus type 1, anxiety disorder, adjustment disorder with depressed mood, mild bilateral carpal tunnel syndrome, mild left cubital tunnel syndrome, alcoholism, and bilateral lower extremity diabetic neuropathies. (R. 12–13).

At step three, the ALJ found that, since July 9, 2014, Plaintiff "has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526)."  (R. 13).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations:

> [Claimant] can occasionally operate foot controls; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and never climb ropes, ladders, or scaffolds. He can frequently reach, handle, finger, and feel with both upper extremities. He should never be exposed to high, exposed places or moving mechanical parts. The claimant can occasionally be exposed to weather, extreme heat, extreme cold, wetness, humidity, vibrations, and atmospheric conditions. He can stand and walk four hours in an eight-hour workday. He can tolerate a low level of work pressure defined as work not requiring multitasking, significant independent judgment, very short deadlines, teamwork in completing job tasks, or more than occasional changes in work setting. The claimant can tolerate occasional interaction with coworkers, frequent interaction with supervisors, and occasional interaction with the public.

(R. 15).

Next, the ALJ found Plaintiff was unable to perform his past relevant work.  (R. 20). But the ALJ determined that based on Plaintiff's age, education, work experience, and residual functional capacity, there were other jobs that he could perform that existed in significant numbers in the national economy.  (R. 21).  Specifically, the ALJ cited testimony from a vocational expert that someone with Plaintiff's RFC could perform the jobs of price marker, mail clerk, and routing clerk.  (R. 21).  Consequently, the ALJ found that Plaintiff was not disabled.  (R. 21).

**III.    LEGAL STANDARDS**

    **A.    Disability Standard**

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The Social Security Administration uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

5

B.  **Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (citation omitted). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is affected by legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

C.  **Evaluating Medical Opinions**

For claims filed before March 27, 2017, as is the case here, the treating physician rule applies, which means that a hearing officer owes some "deference to the medical opinion of a claimant's treating physician." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). In *Estrella v. Berryhill*, the Second Circuit explained the proper steps for applying the treating physician rule as follows:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

> record.'" [*Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)] (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, [the ALJ] must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).

925 F.3d 90, 95–96 (2d Cir. 2019). The Circuit also noted that "[a]n ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id*. at 96 (citing *Selian*, 708 F.3d at 419–20). However, the Circuit recognized that such an error may be harmless if the ALJ otherwise provided "good reasons" for the weight given to a treating physician's opinion. *Id.* (citing *Halloran*, 362 F.3d at 32–33); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

IV.  **DISCUSSION**

Plaintiff challenges the ALJ's decision finding him not disabled, on the grounds that the ALJ's RFC determination "is unsupported by substantial evidence because he failed to properly weigh the opinion of treating psychiatrist, Michael Susco, M.D. and consulting examiner, Jeanne A. Shapiro, Ph.D. in accordance with the prevailing rules and regulations." (Dkt. No. 18, pp. 11–19). In response, the Commissioner contends that the ALJ properly weighed the opinions of Drs. Susco and Shapiro, and that substantial evidence supports the ALJ's decision. (Dkt. No. 22, pp. 3–15).

7

### A. Dr. Susco

On January 2, 2019, treating psychiatrist Dr. Susco completed a medical source statement regarding Plaintiff's mental condition. (R. 890). Dr. Susco opined that Plaintiff had limitations including: 1) he was unable to complete a normal workday and workweek without interruptions from psychologically based symptoms; 2) he was unable to perform at a consistent pace without an unreasonable number and length of rest periods; 3) he was seriously limited in his ability to maintain attention for two hours segments; 4) he was seriously limited in his ability to work in coordination with or proximity to others without being unduly distracted; 5) he was seriously limited in his ability to ask simple questions or request assistance; 6) he was seriously limited in his ability to deal with normal work stress; and 7) he was seriously limited in his ability to interact appropriately with the general public. (R. 891). Dr. Susco noted that Plaintiff had "repeated episodes of deterioration or decompensation in work or work-like setting[s] which cause [him] to withdraw from the situation or experience exacerbation of signs and symptoms." (R. 891). Dr. Susco opined that Plaintiff would have deficiencies in concentration, persistence, and pace resulting in a failure to complete tasks in a timely manner; he would be off task more than 20 percent of an 8-hour workday; and he would be absent more than four days per month due to his impairments or need for treatment. (R. 892).

The ALJ gave Dr. Susco's opinion "limited weight" because it was "not supported by the claimant's treatment notes, clinical findings, or activities." (R. 20). The ALJ recognized that Plaintiff had mental health diagnoses and received inpatient and outpatient treatment, which included medication management and psychotherapy. (R. 17). Nonetheless, the ALJ stated that Plaintiff "was able to engage in a vast array of activities and had limited positive clinical findings." (R. 17). The ALJ noted that Plaintiff spent time hiking, painting, doing odd jobs, and

taking care of his dog. (R. 18–19). Further, the ALJ cited findings that Plaintiff "often exhibited a normal affect," and on several occasions had normal speech, behavior, judgment, thought content, cognition, memory, and good insight. (R. 18–19).

A review of the record shows that at various times Plaintiff appeared to be managing his mental health symptoms and functioning fairly well, which tends to support the ALJ's analysis. In October 2015, he exhibited a depressed and anxious mood, but he had normal speech, behavior, judgment, thought content, cognition, and memory. (R. 823). In November 2016, he had a full affect, clear speech, logical thought processes, and his thought content, cognition, and insight and judgment were within normal limits. (R. 451).

On March 24, 2017, Plaintiff had normal behavior, a happy mood, a normal affect, improving judgment, good insight, intact memory and thought process, no suicidal ideation, and normal attention and concentration. (R. 534). On June 3, 2017, Plaintiff saw Dr. Susco and reported feeling better than he ever had. (R. 662). On September 6, 2017, he was doing well, working at Home Depot, painting house exteriors, and attending 12-step meetings several times per week. (R. 663). His mood was good. (R. 663). On October 4, 2017, Plaintiff said that his mood was stable, his anxiety and depression were well-controlled with medication, and he had no suicidal ideation. (R. 664). On November 1, 2017, Plaintiff reported that he was happy and had been hunting. (R. 666). On December 12, 2017, he was feeling and doing well. (R. 667).

In August 2018, Plaintiff reported that he was doing more than he ever had over the summer, though his moods were up and down. (R. 669). On January 2, 2019, Plaintiff treated with Dr. Susco, who noted that his mood was less depressed and his affect was brighter. (R. 1480). On January 30, 2019, Plaintiff reported things were going well, and on examination his mood was "good" and his affect was calm. (R. 1482).

But the record shows that at other times Plaintiff badly struggled with mental health symptoms. On March 3, 2016, Plaintiff went to the emergency room due to severe depression that had gotten worse such that he "needed to speak with someone." (R. 477). He reported a desire to cause self-harm and requested a psychiatric assessment. (R. 477–79). On August 11, 2016, Plaintiff went to the emergency room again due to anxiety and a relapse after a 10-month outpatient drug and alcohol program. (R. 384). He had been tapering his Suboxone and his alcohol intake increased. (R. 384).

On October 3, 2016, Plaintiff was brought to the hospital after his mother called 911 because he was making suicidal remarks. (R. 315). He took his gun into his car and was trying to drive away. (R. 314–15). He had smashed his diabetes pump and said he did not want to live. (R. 315). His past medical history was noted to include ADHD, anxiety, major depressive disorder, two prior psychiatric hospitalizations, and two prior suicide attempts. (R. 315). On examination, Plaintiff's mood was depressed, his affect constricted, he had thoughts about dying, and his insight, judgment, concentration, and attention span were only fair. (R. 340–41). He was admitted for inpatient care. (R. 351).

On October 26, 2016, Plaintiff returned to the emergency room after his mother called the police because she feared he would hurt himself. (R. 431). She reported that his mood symptoms were severe and constant. (R. 431). On examination, he was mild to moderately belligerent and uncooperative. (R. 433). On October 30, 2016, Plaintiff went to the emergency room due to nausea, vomiting, and anxiety. (R. 1070). He was referred for outside treatment following a suicide attempt, and staff noted his depression diagnosis and that he had used alcohol/drugs to self-medicate. (R. 438). He reported making a plan to end his life. (R. 438). He was depressed and unsure what to do as he was "afraid to be home and alone." (R. 438). On

examination, he avoided eye contact and had a depressed mood and a constricted affect. (R. 441). He was enrolled in counseling five days per week and also attended weekly AA meetings. (R. 445).

On December 3, 2016, Plaintiff reported depression, difficulty sleeping, feelings of guilt and worthlessness, trouble concentrating, and recurrent thoughts of death and suicide. (R. 645). On March 17, 2017, Plaintiff was hospitalized due to an intentional drug overdose. (R. 496). He reported that he "took a bunch of insulin and then smashed his insulin pump then took as much Lexapro, Seroquel and Neurontin as he could." (R. 496). On examination, he was variously somnolent with a dulled or flat affect, a depressed mood, fair attention span, concentration, and insight, and poor judgment. (R. 502, 506, 508, 520). Staff determined that "he would benefit from involuntary psychiatric admission." (R. 514). While hospitalized, Plaintiff was noted to say, "I'm disappointed I woke up." (R. 549).

Critically, the ALJ's decision makes almost no attempt to reconcile these inconsistences in Plaintiff's mental health, failing to recognize that "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence." *Estrella*, 925 F.3d at 97. "[I]n such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id.* Indeed, the Second Circuit has noted that it is especially important in cases involving mental health to consider the frequency, length, nature, and extent of an individual's treatment with a physician (the first *Burgess* factor) in order to evaluate the physician's opinion and get a better picture of the individual's overall condition. *Id.*

Here, the ALJ did not address this factor at all, failing to note that Dr. Susco had seen Plaintiff regularly between 2017 and 2019—a long-term treating relationship that gave Dr.

11

Susco unique insight as to Plaintiff's condition and his limitations.  Further, the Court cannot conclude that this error was harmless because the ALJ did not give good reasons for discounting Dr. Susco's opinion.  The ALJ cited a scattering of positive treatment notes and clinical findings, scarcely mentioning the fact that these often followed Plaintiff's trips to the emergency room, suicide attempts, and/or psychiatric hospitalization.  As the Second Circuit observed in *Estrella*, such cyclical symptoms are common and consistent with potentially debilitating depression.  Thus, the snapshot evidence cited by the ALJ does not justify disregarding Dr. Susco's opinion that Plaintiff was seriously limited due to his mental health.  *See Estrella*, 925 F.3d at 97 ("When viewed alongside the evidence of the apparently cyclical nature of [the claimant's] depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing Dr. Dron's opinion.").

Similarly, the fact that Plaintiff was able to engage in some activities does not, without more analysis, amount to a good reason for discounting Dr. Susco's opinion.  The ALJ noted that Plaintiff spent time hiking, painting, doing odd jobs, and taking care of his dog.  But the ALJ did not explain how the performance of these limited activities—most of which occurred at Plaintiff's leisure at home or outside with little human interaction—contradicted Dr. Susco's opinion that Plaintiff was seriously limited in his ability to maintain attention, work with others, and interact with the public.  As discussed above, it was also incumbent on the ALJ to consider the cyclical nature of mental illness in assessing Plaintiff's activities and what he could do in a work environment on a *sustained* basis.  Therefore, the ALJ's analysis fell short for this reason as well.  *See also Miller v. Colvin*, 122 F. Supp. 3d 23, 30 (W.D.N.Y. 2015) ("Plaintiff's ability to fix some cars in a garage, by himself, for an unspecified duration of time, does not undermine

Dr. Satti's opinion regarding Plaintiff's limitations in terms of performing work-related activities on a full-time basis in a competitive work environment.").

### B. Dr. Shapiro

On March 16, 2017, Plaintiff underwent a consultative psychiatric examination with Jeanne A. Shapiro, Ph.D. (R. 458–462). Plaintiff reported feeling depressed and anxious, and that he had a history of psychiatric hospitalizations. (R. 458). Plaintiff said that he was receiving counseling and saw Dr. Susco monthly for treatment. (R. 459). Dr. Shapiro examined Plaintiff and found that his thought processes were coherent, his affect was flat, his attention and concentration were intact, and his insight and judgment were poor. (R. 460–61). Dr. Shapiro opined that Plaintiff had no limitations for understanding, remembering, or applying simple and complex directions and instructions, using reasoning and judgment to make work-related decisions, and being aware of normal hazards and taking appropriate precaution. (R. 461). Further, Dr. Shapiro opined that Plaintiff had moderate limitations for interacting adequately with supervisors, coworkers, and the public; and moderate to marked limitations for sustaining concentration and performing tasks at a consistent pace, sustaining an ordinary routine and regular attendance at work, regulating emotions, controlling behavior, and maintaining wellbeing. (R. 461–62).

The ALJ gave Dr. Shapiro's opinion only "some weight" because it was "based on one examination, was not entirely supported by Dr. Shapiro's clinical findings, and was not entirely consistent with the totality of the record." (R. 19). The ALJ found that Dr. Shapiro's opinion "was an underestimate of the claimant's mental functional capacity in the context of the objective medical evidence." (R. 19).

Plaintiff disagrees with the reasons given by the ALJ and argues that Dr. Shapiro's opinion should have been afforded more weight. (Dkt. No. 18, pp. 15–18). But the Commissioner points out that Dr. Shapiro, as a consultative examiner, is not subject to the treating physician rule. (Dkt. No. 22, p. 12). Therefore, the ALJ did not have to explicitly consider the *Burgess* factors or give "good reasons" for discounting her opinion. And while the ALJ's analysis could have been more thorough, it did address several factors relevant to evaluating medical opinions under 20 C.F.R. § 404.1527(c). Specifically, the ALJ noted that Dr. Shapiro only saw Plaintiff on one occasion, and as discussed above, medical opinions regarding chronic mental health conditions are more persuasive if based on frequent observations. *See* § 404.1527(c)(2). Dr. Shapiro's clinical findings, particularly those observing that Plaintiff had intact attention and concentration, do not necessarily support her opinion that Plaintiff had moderate to marked limitations for sustaining concentration and performing tasks at a consistent pace. *See* § 404.1527(c)(1). And the ALJ's assertion that Dr. Shapiro's opinion "was not entirely consistent with the totality of the record," while somewhat conclusory, is not inaccurate given the inconsistencies noted above. *See* § 404.1527(c)(4). Overall, the Court finds no error in the ALJ's analysis of Dr. Shapiro's opinion.

### C. Remedy

In general, "[f]ailure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions." *Crysler v. Astrue*, 563 F. Supp. 2d 418, 434 (N.D.N.Y. 2008). As discussed above, the ALJ failed to apply the treating physician rule with respect to Dr. Susco's opinion and did not articulate good reasons for giving it only limited weight. This error almost certainly affected the RFC, as the ALJ did not include any of the more

14

restrictive limitations assessed by Dr. Susco. Consequently, remand is necessary for the ALJ to reconsider Dr. Susco's opinion and its potential effect on Plaintiff's RFC. *See Borush v. Astrue*, No. 05-cv-361, 2008 WL 4186510, at *5, 2008 U.S. Dist. LEXIS 73713, at *14 (N.D.N.Y. Sept. 10, 2008) ("[B]ecause the Court is remanding this case for proper application of the treating physician rule, which might affect the RFC determination, the Court remands this case for further evaluation of Plaintiff's residual functional capacity."). Finally, the ALJ should also consider the unique, cyclical nature of mental illness and its impact on Plaintiff's limitations, keeping in mind the Second Circuit's guidance in *Estrella*.

### V.     CONCLUSION

For these reasons, it is

**ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk amend the caption to substitute KILOLO KIJAKAZI, Acting Commissioner of Social Security, for Defendant "Commissioner of Social Security"; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:   March 9, 2022
            Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge